**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**FORT WAYNE DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| v. | ) | **Cause No. 1:08-CR-26** |
| | ) | |
| **TYBRUS NELSON** | ) | |

## REPORT AND RECOMMENDATION

Before the Court is a Motion to Suppress (Docket #34) filed by the Defendant Tybrus Nelson on January 9, 2009. The Government responded on January 26, 2009 to which Nelson replied on February 11, 2009. Pursuant to the Federal Magistrate's Act, as amended, Title 28 U.S.C. § 636(b)(1)(B), (C), and Federal Rule of Criminal Procedure 59(b), District Judge William C. Lee referred this matter to the undersigned Magistrate Judge for the issuance of a Report and Recommendation. (Docket # 35.) In accordance with the above authorities, the Magistrate Judge recommends that Nelson's motion to suppress evidence be DENIED based on the following facts and principles of law.

## I. PROCEDURAL BACKGROUND

On March 26, 2008, a federal grand jury returned a three count indictment charging Nelson with two counts of possession with the intent to distribute a controlled substance, in violation of 21 U.S.C. § 841(a)(1), and a third count of possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c). (Docket # 15). The indictment followed Nelson's arrest on March 7, 2008, that arrest occurring after a warrant was obtained to search various residences/locations which yielded evidence of drug activity. The present motion to suppress relates to these searches with Nelson contending that the search warrants were defective on their face and

were issued without probable cause.

The warrants in question were issued for Nelson's residence at XXXX Londonderry, his place of employment, XXXX South Clinton Street, and a residence, believed to be owned by Nelson's sister at XXXX Evard Road all in Allen County, Indiana. A fourth warrant was issued for Tamera Senior Villas, where Nelson's mother resided, located at XXXX John Street but the scope of that warrant was limited to the search of a garage #9.[1] All four warrants relied upon the same recitation of facts to establish probable cause. The 19 page search warrant affidavit was signed by Fort Wayne Police Detective Darrin Strayer ("Detective Strayer") and recited the following facts, which the Allen Superior Court Judge determined constituted probable cause for the issuance of the warrants:

- In October 2006, Fort Wayne Police Detective Craig Wise received anonymous information that a male black named "Ty" who lived in the Arlington Park Subdivision was dealing large amounts of narcotics. Thereafter, Detectives learned that a black male named Tybrus Nelson lived at a residence in Brookshire Circle and owned a white Buick.

- On November 11, 2006, during surveillance conducted at the Brookshire Circle residence police observed a white Buick which was registered to Zakia Scoggins-Nelson. Police also observed a grey 2003 Lincoln LS pull up to the house. The driver exited the vehicle with a white plastic bag and carried it into the Brookshire Circle address. When the driver exited the house, along with Tybrus Nelson, the bag appeared empty. The driver then left in his grey Lincoln and Nelson left the residence in the white Buick. Officers conducted a traffic stop on the grey Lincoln and arrested the driver. The driver had 2.5 grams of cocaine on his person. The white plastic bag also contained a white powder residue which tested positive for cocaine. The driver admitted cooking crack inside the Brookshire Circle residence two days before his arrest.

- Nelson was stopped by police and was found to have a large "wad" of money,

---

[1]The Government redacted the street addresses from the Search Warrant Affidavit although those street addresses already appear in the record in the Defendant's Motion to Suppress Evidence. Regardless the various addresses will be referenced by the Court herein as "the Londonderry property," "the S. Clinton property," "the Evard Road property," and "Garage #9."

several 100 bills, 50 bills, 20 bills and 10 bills. The money was returned to Nelson when he told police he worked at an auto detail shop on Anthony and Maumee. The officer never observed Nelson at this location during their investigation.

- On November 14, 2006, surveillance on Brookshire revealed that Nelson exited the house, and drove to a residence on Evard Road. Nelson entered the residence, stayed a few minutes and left - he then drove back to his house. FWPD Spillman showed that Latasha Nelson lived at the Evard address and is Nelson's sister.

- A trash run was conducted at the Brookshire Circle address on December 10, 2006. From the trash set out for pick up, the detectives located clear plastic baggies and latex gloves. Based on the affiant's experience, plastic baggies are often used in the packaging of narcotics for sale and latex gloves are utilized by traffickers to protect their hands while packaging, cooking or cutting narcotics.

- Surveillance set up on Ravenscroft Beauty College on Stellhorn Road on December 13, 2006, with knowledge that Nelson would be leaving class at 2100 hours. Nelson was observed leaving class and walking to his vehicle. The affiant saw Nelson reach into his crotch area attempting to retrieve something - and noted that Narcotics traffickers often hide narcotics in this area. Nelson then entered the passenger side of a vehicle driven by a female white. Nelson was inside the van for a few seconds then exited. The white female left in the van and a traffic stop was conducted. The white female refused consent to search her vehicle. Spillman records showed that the white female had domestic reports where her husband has complained that she has a severe narcotics problem and family members had given her $75-90,000 over a three year period.

- Surveillance was conducted on 1/8/07 at Ravenscroft Beauty College where Nelson was seen leaving class, entering his white Buick and driving to his residence on Brookshire. Nelson was inside the residence for approximately 5 minutes and then he left and was followed to XXXX Evard Road where he entered the residence. After being inside for 3-5 minutes, Nelson left the residence. Detectives followed Nelson to XXXX Evard Road where he pulled into a driveway, stayed for 3-5 minutes and left. Nelson then proceeded to Millbrook Apartments, XXXX, and was seen exiting the apartment after being inside for 2-4 minutes. Nelson then returned to his home at 2245 hours

- On 2/12 and 2/20/07 FWPD detectives saw Nelson driving two different vehicles that were rentals from Hertz. The affiant indicated it was not uncommon for drug dealers to use rental vehicles - which they do for two reasons: it gives the driver deniability if narcotics are found inside and it protects the dealer's vehicles from forfeiture for transporting narcotics.

- Surveillance was set up on 2/20/06 at Ravenscroft Beauty College and saw Nelson

exit the college, and get into a maroon Kia with Illinois plates that was a Hertz rental vehicle. Nelson was then followed to XXXX Evard Road where he arrived at 2107 hours. At 2212 Nelson exited the apartment carrying a black bag that he placed in the back passenger seat. Nelson was then followed to the area of XXXX Queen and noticed a male black was in the front passenger seat who exited the vehicle after being inside for 2-3 minutes. Nelson then drove to the area of Abbot and McKinney and shut off his lights. An older Cadillac parked behind Nelson and the driver of the Cadillac exited his vehicle and approached Nelson's window for less than 30 seconds after which both vehicles left the area.

- Surveillance was set up on Brookshire on 3/22/07 when Nelson was seen leaving his residence at 0949 hours. Nelson drove to Northwood Plaza, and met up with a green van parked in front of Pearl Vision. The van's plates returned to [redacted]. A female white, exited her van and got into Nelson's Buick for about 3 minutes. The female exited Nelson's vehicle and both left the plaza and Nelson was followed to XXXX Evans. A tan Cadillac arrived and a black male got into the passenger seat. After about 4 minutes, Nelson was seen leaving the area alone. Nelson traveled to the area of XXXX Stardale and detectives lost site of him until he arrived home at 1105. At 1215 a maroon Corsica with handicap plates ([redacted] Drexel for a 1992 maroon chevy) arrived at Nelson's house, a female black, identified as [redacted] exited the vehicle and entered the house. At 1217 Nelson and [redacted] exited the house and got into the Corsica. Detectives followed the two to Tamera Senior Villas located at John and US 27. A detective observed Nelson exit garage 9 or 10 (they are not labeled but the rest of the garages have large black numbers). Nelson and [redacted] left the area and returned to XXXX Brookshire Circle at 1306 hours. At 1318 a Buick (registered to [redacted] left the house. [Redacted] had numerous narcotics involvements in the Spillman system. Less than a month ago, detectives had executed a search warrant at [redacted] residence where 30 lbs of marijuana and wrappers for 7 to 8 kilograms of cocaine and approximately 150 lbs of marijuana were found.

- Detectives conducted surveillance at XXXX Brookshire Circle on 3/23/07 and saw a red Chevy Impala with Missouri plates sitting in front of the house - the vehicle returned to Hertz Rentals. Nelson left the house in the Impala at 1125 and drove to the Northwood Plaza where he met with the white female who was driving the same green van. The white female entered Nelson's vehicle and exited 2 minutes later and left the area while Nelson returned home at 1136 hours. At 1202 a maroon Corsica arrived at XXXX Brookshire Circle, [redacted] exited the vehicle and entered the front door. At 1210 hours Nelson and [redacted] exited the house and entered the Chevy Impala rental. Nelson and [redacted] arrived at the Walgreens at Stellhorn and Maplecrest at 1213 hours. A male white pulled up and got into Nelson's vehicle and at 1214 exited the Impala and got back into his Buick. The male left the area and Nelson and [redacted] drove around northeast Fort Wayne. At 1236 the two arrived at Walgreens, entered the store and exited within two minutes with bags. The two

then arrived at XXXX Evard Road and entered the apartment carrying the bags from Walgreens. At 1350, both exited XXXX Evard Road; Nelson locked the front door (indicating he had a key and ready access to the apartment). Nelson was carrying a white bag and he and [redacted] returned the vehicle that [redacted] now drove. Detectives followed the two to the area of Baxter east of Hanna, arriving at 1414. Nelson entered an unknown house on Baxter and left the area with [redacted] at 1416. Surveillance lost the two in the area of Queen and McKinney for a short time and located them at 1425 and followed them to XXXX Brookshire where they arrived at 1449. At 1502, [redacted] left the house in the maroon Corsica, carrying 2 bags of trash. The affiant noted that narcotics traffickers who are aware of police tactics will dump their trash at discreet locations to prevent the contents from being examined by police for possible evidence relating to narcotics trafficking.

- Detectives observed Nelson exiting Brookshire at 0951 on 3/22/07 and entering his white Buick Regal. Nelson was followed to the BP gas station at Stellhorn and Maplecrest. Nelson began pumping gas and the same maroon Buick from 3/23/07 parked at the Dairy Queen lot just south of the gas station. The same white male from 3/23/07 walked over to Nelson's white Buick and entered it. Nelson then entered his white Buick and was observed talking with the white male. A couple minutes later, the white male exited the Buick and ran directly back to his maroon Buick. Detectives followed the maroon vehicle and a traffic stop was conducted on this vehicle for a traffic violation. During the traffic stop, 5 grams of cocaine were located inside the maroon Buick and a passenger, who later became a CI, admitted possession of the crack and admitted to purchasing the crack cocaine from a male black named "Ty" at the BP gas station located at Stellhorn and Maplecrest. Nelson returned home at 1004 hours. At 1022 hours, Nelson got back into his white Buick and drove to the area of XXX Queen Street and met with a male black for a few minutes, then traveled to the Tamera Senior Villas on John Street where his mother resides. This address is the same address at which garage #9 is located.

- On 3/30/07, a call was placed by a CI to "Ty" on Ty's cell phone (418-1501) seeking to purchase an 8 ball of crack cocaine. "Ty" asked the CI about the traffic stop on 3/29/07 where the CI had been pulled over. "Ty" told the CI that he would call him back when everything was smoothed over regarding the traffic stop. The CI was never able to deal with Nelson after the traffic stop on 3/29/07. According to the affiant, this was significant because higher volume traffickers are careful about dealing with individuals who have recent contact with law enforcement, fearing the individual may be an informant.

- On 6/13/07, at approximately 2130 hours, a Detective noticed Nelson driving his white Buick in the area of Lafayette and Wallace. Nelson was followed to a video store - which he entered and exited 15 minutes later. Nelson then entered his vehicle and the white female then got into Nelson's vehicle and exited 1-2 minutes later. The white female had driven a maroon Pontiac and she left in that while Nelson left in

his
Buick and proceeded to the area of the Hillsboro Addition. Nelson was in the neighborhood for 2 - 4 minutes and then was followed driving to XXXX Evard Road. Nelson was at the residence for 1-2 minutes and then left to return to his home.

- In June of 2007, a "For Rent" sign was placed for the duplex of Nelson's home at XXXX Brookshire. Detectives monitored the address to see if he was moving to a new home.

- On 7/18/07 Detectives placed a Global Positioning Satellite (GPS) device on Nelson's white Buick which was parked on the street in front of the house. On 7/23/07 the GPS device showed that Nelson drove to the end of John Street at the Tamera Senior Villas at 1526 - close to where garage #9 is located - he left after one minute.

- On 8/6/07 Detectives again placed a GPS device on Nelson's white Buick as it was parked on the street. On 8/10/07, the device showed that Nelson drove to the area of XXXX John Street at Tamera Senior Villas and parked by the storage units (garage #9) for 38 minutes before leaving. On 8/12/07, the device showed that Nelson's vehicle ended in the 6400 block of Londonderry.

- Surveillance noticed vehicles associated with Nelson were at XXXX Londonderry. A check of the utilities showed they were in the name of Zakiya-Scoggins, who was Nelson's wife since August 2007. It was determined that Londonderry was the new residence for Nelson.

- On 8/28/07 another CI contacted Detective Wise and advised him that he (the CI) had made arrangements to purchase an 8 ball of crack cocaine from Tybrus Nelson. This particular CI had provided FWPD in the past with information that had been verified as credible and reliable, resulting in arrests and seizures of evidence related to narcotics on at least 3 other cases. The CI was searched for contraband, nothing was found. The CI was fitted with an electronic monitoring/recording device and given $100 of pre recorded buy money. Under the supervision of the detective, the CI placed a call to Nelson (418-1852) and Nelson said to meet him at the Grand Saloon, XXXX Wayne Trace. The detective had the CI place another call to Nelson and Nelson asked how much they wanted. CI asked for $100 worth of crack cocaine and Nelson asked them to pull onto Manford Street. Nelson then arrived in his white Buick and the Detective positively identified the driver to be Tybrus Nelson. The CI exited the detective's vehicle and got into the passenger seat of Nelson's car. Over the listening device, detectives could confirm that a deal took place - the CI exited Nelson's vehicle, walked back to the detective' vehicle and immediately handed over the suspected crack cocaine. The CI and detective left the area and a post buy search of the CI revealed that no contraband was found, the CI was debriefed and released. The suspected cocaine was field tested and showed a positive response for cocaine

with a substance weight of 3.3 grams.

- On 9/29/07, Detective Wise again met with the CI from the previous deal to purchase crack cocaine from Tybrus Nelson. The CI was searched for contraband and none was found. The CI was fitted with an electronic monitoring/recording device and given $200 in pre recorded buy money. Under the detective's supervision, the CI called Nelson (418-1852) and asked for a "quad" meaning 2 8 balls of crack cocaine. Nelson said that he had to pick up the crack and would meet them at the Grand Saloon on Wayne Trace. Another call was placed to Nelson by the CI and Nelson indicated he would be there in two minutes and to meet him at the 2900 block of Manford Street. Nelson arrived in the white Buick, pulled behind the detective's vehicle and the CI exited the detective's car and got into Nelson's. Over the listening device, detectives could discern that the deal took place. The CI exited Nelson's vehicle, returned to the detective's vehicle and immediately handed over the suspected crack cocaine. The CI and detective left the area, and a post buy search revealed that no contraband was found, the CI was debriefed and released. The suspect cocaine was field tested and showed a positive response for cocaine with a substance weight of 6.4 grams.

- On 1/23/08, detectives set up surveillance at XXXX Londonderry at 1620 hours. At 1626, a detective noticed a 2002 Cadillac Escalade with a Hoosier Safety Plate pull in to the driveway, driven by Tybrus Nelson, who was followed by a maroon Corsica with a handicap plate driven by [redacted]. At 1628, [redacted] drove Nelson to the Napa Auto Parts store on Anthony and Maumee, where Nelson exited the vehicle. Nelson's white Buick was parked in the lot. Nelson got into his white Buick and drove to XXXX S. Clinton to Father and Son's Barber Shop. A business card from the business showed that Tybrus Nelson was a barber at the shop and the master barber was [redacted].

- On 1/30/08, detectives conducting surveillance at XXXX Londonderry saw Nelson pull into the driveway at 0927 hours. At 1034 Nelson left his house in the Buick and saw that he had a new Hoosier Safety Plate. Nelson was followed to the Father and Son's Barber Shop at XXXX S. Clinton, and Nelson was seen unlocking the front door. At 1111, a dark Toyota occupied by three individuals pulled into the parking lot of the shop. A male black exited the Toyota and got in to the passenger seat of Nelson's vehicle. The male black and Nelson met for approximately 1 minute and the black male returned to the Toyota. Nelson left the Barbershop and drove to Tamera Senior Villas at US 27 and John Street. Nelson was in the complex for two minutes and then returned to the Barbershop. The same black male got back into the passenger seat of Nelson's vehicle for 1-2 minutes after which the male black exited the vehicle and Nelson returned to the barbershop. The male black went back to the Toyota which had Indianapolis plates. Detectives followed the Toyota to the 400 block of West Williams where it was parked for 5- 7 minutes and the same black male exited the back seat of the Toyota and got into a Ford Explorer with

Indianapolis plates. Detectives followed the Toyota and a traffic stop was conducted after a traffic violation was committed. During the stop, $10,000 was located in the back seat of the Toyota. A K-9 was run on the Toyota and indicated a "hit" on the car when it sat and stared at the rear door of the vehicle indicating the presence of drugs. The K-9 stared at the area of the back seat indicating possible drugs or drug scent in the area. K-9 also indicated drug scent in the area where the money had been laying on the floor of the vehicle. The K-9 is trained to sit and stare when he smells the _____ scent of narcotics and he and his handler are trained by the International Police Work Dog Association - their last certification being November 2007. The K-9 is certified for the detection of narcotics odors and three in the fields hits for narcotics. During this time, surveillance was being conducted at the Barbershop and a maroon Corsica driven by [redacted] pulled into the parking lot. Nelson entered the passenger side of [redacted] vehicle. Detectives followed the two to the area of Abbott and Drexel and then lost the vehicle. When the affiant drove to XXXX Evard Road, he got there at 1234 hours in time to see Nelson and [redacted] exiting the apartment. Nelson was seen locking the door with a key. [Redacted] then drove them to the area of Coliseum and Pontiac where detectives lost sight of it and then noticed it driving in the 2700 block of Evans.

- On 1/31/08, detectives conducted surveillance at XXXX John Street (Nelson's mother's residence) and XXXX S. Clinton (Barbershop). At 1240 Nelson arrived at XXXX John Street in a white Buick and waited until an older female, Nelson's mother, came out to his vehicle. They drove to the Scotts on Decatur Road. A phone call was made to Nelson's cell (418- 8555) and Nelson advised he was up north grocery shopping with his mother. They returned to XXXX John Street at 1325 hours and Nelson helped his mother carry in groceries. Nelson left and drove to the Barbershop. Spillman records showed that Brenda Nelson lives at XXXX John Street at the Tamera Senior Villas and that she is Tybrus Nelson's mother. At 1444 hours a maroon Ford backed in next to Nelson's vehicle. Nelson exited the shop and got into the passenger side of the Ford. Nelson was inside for less than a minute and exited the vehicle and returned to the shop. The plate returned to a couple living on Lahmeyer Road and the driver was a white female. At 1700 hours, the affiant drove by the Barbershop and saw Nelson locking up and then noticed a male black and Nelson get into a maroon F-150 truck. After being inside the truck for approximately 2 minutes, Nelson exited the vehicle and got into his white Buick. Both vehicles left the parking lot.

- On 2/7/08, detectives conducting surveillance at XXXX S. Clinton at the Barbershop saw Nelson exit the shop and get into his white Buick. At 1711 hours a maroon truck pulled into the lot, the driver exited the vehicle and got into Nelson's vehicle. At 1721 hours the driver of the truck exited Nelson's car and entered the truck. Both vehicles left. Detectives followed Nelson to XXXX Avondale where he parked in front of a house - he entered the house for two minutes and left. Nelson drove to the driveway of XXXX or XXXX Huestis and stayed for 3-4 minutes and then detectives

lost him in traffic.

- On 2/5/08, detectives conducted surveillance at XXXX S. Clinton at the Barbershop and at 1133, Nelson arrived and unlocked the front door to the shop. At 1209 hours, a Buick pulled into the lot and a male black exited his vehicle and entered the shop. At 1219 a grey colored truck pulled into the lot and at 1224 hours, Nelson exited the shop and got into the grey colored truck. Nelson exited the vehicle after 3 minutes and went back inside the shop. Detectives followed the truck to the Napa Auto Parts on Anthony and Maumee. At 1229 hours, Nelson and the driver of the Buick exited the shop and got into Nelson's white Buick. Both exited the vehicle after 2 minutes, Nelson returned to the shop and the other Buick left the area. At 1301 a male black was dropped off by a Ford Explorer and he entered the shop for one minute before exiting and getting back into the Ford Explorer. At 1307 hours, a silver mini van pulled into the lot and a male black entered the shop - at 1327 Nelson exited the shop, and got into his white Buick. At 1328, the male black from the mini van exited the shop and got into Nelson's vehicle until 1329. Nelson left in his Buick and the male black exited left in his mini van.

- On 2/27/08 a detective spoke with the apartment manager for the Tamera Senior Villas about Garage #9 - and learned that Brenda Nelson, Tybrus Nelson's mother - rents out that garage.

- On 2/2/08, detectives saw Nelson arrive at XXXX Londonderry at 0954 - he pulled into the driveway and entered the garage area. Detectives then saw him at the barbershop at XXXX S. Clinton at 1327 hours. At 1417 hours, a 1998 silver Cadillac arrived at the shop with plates that returned to a [redacted] living in an apartment on Lakeside drive. Spillman records show that [redacted] lives at this same address and he was seen leaving Nelson's house on 11/2/06 when he was arrested for possession of cocaine and had a bag full of cocaine residue. Nelson entered the vehicle and they drove to the area of XXXX Lillie. They were there for 3-5 minutes when another male black entered the vehicle and they all drove back to the barbershop. Nelson left in his vehicle and returned to the shop 45 minutes later.

- On 2/29/08 Nelson was seen parking his white Buick in the driveway of XXXX Londonderry at approximately 0848. Nelson entered the front door - and left at 1015 where he was seen driving to XXXX Evard Road. Nelson walked to the front door, unlocked it and entered. Nelson was seen exiting the apartment and started a black Mercury that was parked in front of the apartment. The vehicle was registered to Nelson's sister, Latasha Nelson at XXXX Evard Road. After 20 minutes, Nelson shut off the Mercury and left in his Buick. Detectives followed Nelson to the Kmart on Coliseum where he met with a male black who drove an older model Oldsmobile. The male black got into Nelson's vehicle and exited less than 30 seconds later. Both vehicles left the area.

- Detectives had learned through surveillance that Nelson drives to different parking lots and different houses and meets with many individuals. These encounters with numerous people have varied from one to ten minutes. From the affiant's training and experience, these are strong indicators of drug transactions. Typical narcotics transactions take less than ten minutes. It was noted that these transactions consistently occurred every time Nelson was under surveillance, indicating that this conduct has been occurring over an extensive period of time and continues to date.

Based upon these observations and the Detective's training, Strayer further averred:

- that drug traffickers often have firearms on their person or in their homes. This is to protect themselves against burglaries or reprisals from other dealers/users. Drug dealers fear calling police because it may bring attention to their illegal activities and they need to protect themselves. It is common for drug traffickers to keep track of their narcotics transactions by way of written, typed, printed or computer records. Dealers, like any other business keep track of whom they owe money/drugs and who owes them money/drugs. These records are referred to as "drug ledgers."

- High level narcotics traffickers purchase vehicles, homes, businesses or other property for purposes of laundering money obtained from illegal drug dealing. To conceal their activities, dealers put these assets in the names of close friends/associates or relatives. For example, XXXX Londonderry as well as the vehicles associated with Nelson were listed in his wife's name.

- XXXX Evard was owned or at least controlled by Nelson despite it being legally owned in the name of his sister Latasha Nelson; Nelson had also been seen entering the location on several occasions with his own key.

- the barbershop at XXXX S. Clinton is owned or controlled by Nelson based on the fact that he had been seen opening and closing the business with his own key. The affiant believed the Barbershop was being used both as a barbershop and a means to launder money associated with illegal narcotics trafficking.

- Garage #9 of Tamera Senior Villas, XXXX John Street, was utilized by Nelson as a "stash" location for drugs/money due to the fact that Nelson's mother resides at these senior villas, garage 9 is under her name and Nelson has been seen at and followed to the direct area of that garage both before and after suspected narcotics trafficking.

- Nelson's home at XXXX Londonderry will contain evidence of drug trafficking. The residence has been identified as Nelson's home by direct observation as well as records showing the utilities in his wife's name. Based on his involvement in narcotics search warrants, the affiant has found that it is common for police to find records associated with trafficking, narcotics, firearms, paraphernalia, and money

among other evidence related to trafficking in dealer's homes.

With these facts before him, the issuing judge determined that probable cause existed to search the Evard Road property, the Londonderry property, the S. Clinton property and Garage #9 for "[c]ocaine and derivatives thereof, United States Currency, firearms, records – including electronic and paper records – of drug transactions and/or other financial information related to narcotics trafficking." See, Gov't Exh. A, pp. 20-23.

## DISCUSSION

The Fourth Amendment states that "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." *United States v. Sims*, 553 F.3d 580, 582 (7th Cir. 2009). "The Fourth Amendment, read literally at any rate, does not require warrants; it merely restricts them. It does not forbid searches without warrants; it merely forbids unreasonable searches." *Id.* Where, however, as in the present case, a warrant has issued, the Fourth Amendment requires that the facts supporting issuance of the warrant be justified by a finding of probable cause from a neutral and disinterested magistrate before commencing a search. *See Jones v. Wilhelm,* 425 F.3d 455, 462 (7th Cir.2005). Probable cause is established when, considering the totality of the circumstances, there is sufficient evidence to cause a reasonably prudent person to believe that a search will uncover evidence of a crime. *See Illinois v. Gates,* 462 U.S. 213 (1983).

This said, however, "the Fourth Amendment is a personal right that must be invoked by an individual." *Minnesota v. Carter,* 525 U.S. 83, 88 (1998); *United States v. Jackson,* 189 F.3d 502,

507 (7th Cir.1999) (internal quotations omitted).[2]   Therefore, a defendant raising a Fourth

Amendment challenge must first demonstrate that he has a personal right[3] to object to the search.

This requires the defendant to show that he had a reasonable expectation of privacy in the area

searched, in other words, (1) the defendant exhibits an actual or subjective expectation of privacy,

and (2) the expectation is one that society is prepared to recognize as reasonable. *United States v.*

*Mendoza,* 438 F.3d 792, 795 (citing *Katz v. United States,* 389 U.S. 347(1967)); *see Kyllo v. United*

*States,* 533 U.S. 27, 33 (2001).

Although search warrants were issued for four different locations, the charges in the present

indictment stem  from the evidence seized from Nelson's person (Count I),[4] and evidence obtained

from execution of the warrant at the Evard Road property (Counts 2 and 3).[5]  *See Gov't's Response*

at pp. 1-2.   The Government further represents that, while it has not done so, it may supersede the

present indictment to include a charge for the items recovered from the search of Garage #9.  At

present, however, the items seized from the garage are not the subject of a criminal indictment.

Thus, at this point, the Government appears to concede, or at least not contest, that Nelson has

---

[2] This follows from the Supreme Court's long-standing observation that the Fourth Amendment "protects people, not places," *Katz v. United States,* 389 U.S. 347 (1967).

[3] While parties often refer to this concept as being one of "standing" to contest a search, the Supreme Court has noted that "in determining whether a defendant is able to show the violation of his (and not someone else's) Fourth Amendment rights, the 'definition of those rights is more properly placed within the purview of substantive Fourth Amendment law than within that of standing.' " *Minnesota v. Carter,* 525 U.S. 83(1998) (quoting *Rakas v. Illinois,* 439 U.S. 128, 140(1978)); *United States v. Figueroa-Espana,*  511 F.3d 696, 703 (7th Cir. 2007).

[4] Recovered from Nelson's person were approximately 25 grams of cocaine base crack, approximately 13 grams of cocaine base, $1,660 in cash, keys to a Cadillac located in Garage #9, a garage opener to Garage #9, a key to the safe at the Evard Road property, and a key to the Londonderry residence.

[5] The search of the Evard Road property uncovered powder and crack cocaine, a .45 caliber weapon, magazines and ammunition.

established a reasonable expectation of privacy in the Evard Road property by virtue of his utilization of his own key for ingress and egress from the property. (Gov't Resp. at p. 2; *see also*, Search Warrant Affidavit, at p. 17: "I believe that Evard is owned or at least controlled by Nelson...[t]his is due to the fact that he has been seen entering the location on several occasions with his own key).

What the Government has not conceded is that Nelson had a reasonable expectation of privacy in Garage #9 so as to be entitled to invoke the protections of the Fourth Amendment in the items seized from that location. In fact, Nelson has put nothing before the court other than the contents of the Search Warrant Affidavit which would establish his interest in that location. Indeed, "without an affidavit or testimony from the defendant, it is almost impossible to find a privacy interest because this interest depends, in part, on the defendant's subjective intent and his actions that manifest that intent." *United States v. Mendoza,* 438 F.3d 792, 795 (7th Cir. 2006)*(quoting United States v. Ruth,* 65 F.3d 599, 605 (7th Cir. 1995)).[6] Accordingly, the focus presently is on whether, as argued, the facts in the Search Warrant Affidavit were sufficient to establish probable cause for the Evard Road property, the Londonderry property, and the S.Clinton property, about which there appears no dispute as to Nelson's expectation of privacy.

As noted earlier, the Fourth Amendment requires that a warrant must be supported by probable cause, i.e., "a fair probability that contraband or evidence of a crime will be found in a particular place." *Miller,* 314 F.3d at 268 (internal quotation marks omitted). The Supreme Court

---

[6]Further, the defendant conceded no hearing was necessary and indicated his intent was to rely solely on the search warrant affidavit. Indeed, it is understandable that Nelson would not want to present evidence of his control over the garage as that evidence might be utilized against him to demonstrate his involvement in the illegal activities and/or with the evidence seized from that location.

has held that the sufficiency of a warrant is analyzed using a totality-of-the-circumstances approach; "the duty of a reviewing court is simply to ensure that the [issuing] magistrate had a 'substantial basis for ... conclud[ing]' that probable cause existed." *Illinois v. Gates,* 462 U.S. 213, 238-39 (1983). Indeed,

> The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.

*Gates,* 462 U.S. at 238. "In issuing a search warrant, a magistrate is given license to draw reasonable inferences concerning where the evidence referred to in the affidavit is likely to be kept, taking into account the nature of the evidence and the offense." *United States v. Singleton,* 125 F.3d 1097, 1102 (7th Cir.1997). For example, in issuing a warrant, a judge may infer that evidence of drug dealing is likely to be found where a dealer lives. *Id.* "[W]hen observing activity of a person suspected of criminal activity, Government agents are entitled to reasonably rely upon their special knowledge and expertise to assess probabilities and draw inferences," *United States v. Marin,* 761 F.2d 426, 432 (7th Cir.1985), and a judge may take into account the experience and special knowledge of officers if the search warrant affidavit explains the significance of specific types of information, *United States v. Lamon,* 930 F.2d 1183, 1189 (7th Cir.1991).

"[A]fter-the-fact scrutiny by courts of the sufficiency of an affidavit should not take the form of *de novo* review. A judge's 'determination of probable cause should be paid great deference by reviewing courts.' " *Gates,* 462 U.S. at 236 (quoting *Spinelli v. United States,* 393 U.S. 410, 419 (1969)). "[T]he duty of a reviewing court is simply to ensure that the magistrate had a substantial

basis for concluding that probable cause existed." *Id.* at 238-39 (quotation marks, brackets, and ellipsis omitted). "A magistrate's determination of probable cause '... should be overruled only when the supporting affidavit, read as a whole in a realistic and common sense manner, does not allege specific facts and circumstances from which the magistrate could reasonably conclude that the items sought to be seized are associated with the crime and located in the placed indicated.' " *Newsom,* 402 F.3d at 782 (quoting *United States v. Spry,* 190 F.3d 829, 835 (7th Cir.1999)).

"If the search or seizure was effected pursuant to a warrant, the defendant bears the burden of proving its illegality ...." *United States v. Longmire,* 761 F.2d 411, 417 (7th Cir.1985). "When, as here, the affidavit is the only evidence presented to the warrant-issuing magistrate, 'the warrant must stand or fall solely on the contents of the affidavit.' " *United States v. Koerth,* 312 F.3d 862, 866 (7th Cir.2002) (quoting *United States v. Roth,* 391 F.2d 507, 509 (7th Cir.1967)).

The facts from which the issuing judge found probable cause were detailed and included an eighteen month period of observation by detectives, the use of confidential informants to make controlled buys of narcotics as well as personal observations by Detective Strayer. Police made numerous arrests and traffic stops of persons who came into contact with Nelson and who, in turn, indicated to detectives that they had purchased crack cocaine from him. Police corroboration of various informants' information is extensive. The police conducted surveillance and observed Nelson entering and leaving all of the locations for which the warrants were issued. The police utilized GPS devices to track and record Nelson's whereabouts and to further confirm the onsite observations of the officers. Further, from his training and observations, Detective Strayer presented competent specialized knowledge of the drug trade and presented facts in the affidavit to justify his belief that the items sought would be found at the locations indicated. All in all, based upon the

facts contained within the affidavit, the issuing judge could have reasonably concluded that probable cause existed.

Nevertheless, Nelson's response takes issue with bits and pieces of the affidavit, contending that there is no nexus between the locations from which evidence was sought and the illegal drug activity, and that it was unreasonable for the issuing judge to rely on information that was eighteen months old. But, the Seventh Circuit has made clear that probable cause affidavits are to be "read as a whole in a realistic and common sense manner." *United States v. Quintanilla,* 218 F.3d 674, 677 (7th Cir.2000) (quoting *Spry,* 190 F.3d at 835). The issuing judge here is presumed to have done just that. Moreover, the judge did not rely on simply one transaction or one event that occurred eighteen months prior to the application for a search warrant; rather, he relied upon a series of events and a lengthy investigation which proved to last eighteen months. In addition, while none of the drug transactions observed by police occurred at any of the locations searched, Nelson was surveilled leaving these various locations, meeting with others, and engaging in what appeared to detectives to be drug transactions and then returning to one of the locations. Thus, it is logical based upon these facts to presume that evidence of drug trafficking may be found at the various locations that Nelson accessed before and/or after the drug transactions occurred. Accordingly, no fault can be found concerning the finding of probable cause under these circumstances.

Moreover, even if probable cause was lacking, the fruits of the search are undoubtedly admissible under the good faith exception to the exclusionary rule articulated in *United States v. Leon*, 486 U.S. 897 (1984). Under *Leon,* it is inappropriate to suppress the fruits of a search conducted pursuant to a later-invalidated warrant provided the executing officers relied on the warrant in good faith. *Leon,* 468 U.S. at 922-23; *United States v. Woolsey,* 535 F.3d 540, 546 (7th

Cir.2008). That the officers obtained a warrant is itself prima facie evidence of good faith. *Leon,* 468 U.S. at 922; *United States v. Watts,* 535 F.3d 650, 657 (7th Cir.2008).

Of course, Nelson can rebut that presumption by demonstrating, as relevant here, that the supporting affidavit was " 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable.' " *Leon,* 468 U.S. at 923 (quoting *Brown v. Ill.,* 422 U.S. 590 (1975)) But the supporting affidavit in this case falls quite short of this type of finding. Indeed, as has already been discussed, the affidavit recounts numerous observations of drug transactions or suspicious drug-related activity, details arrests of persons within minutes of meeting with Nelson, shows a pattern of ingress and egress from the various locations immediately prior to suspected drug transactions, and has admissions from persons that they purchased crack cocaine from Nelson. On the whole then, the court cannot conclude that the affidavit is so deficient that a reasonable officer would necessarily have questioned it. *See, e.g., Hollingsworth,* 495 F.3d at 803-05; *Sidwell,* 440 F.3d at 869-70; *United States v. Stevens,* 380 F.3d 1021, 1024-25 (7th Cir.2004).

## CONCLUSION

Based on the foregoing, the Magistrate Judge recommends that Nelson's Motion to Suppress be DENIED. (Docket # 34) . The Clerk is directed to send a copy of this Report and Recommendation to the Government and to counsel for Nelson. NOTICE IS HEREBY GIVEN that within ten days after being served with a copy of this recommended disposition a party may serve and file specific, written objections to the proposed findings and/or recommendations. 28 U.S.C. § 636(b)(1)(C). FAILURE TO SERVE AND FILE OBJECTIONS WITHIN THE SPECIFIED TIME WAIVES THE RIGHT TO APPEAL THE DISTRICT COURT'S ORDER. 28 U.S.C. § 636(b)(1)(B); Fed. R. Crim. P. 59(b); L.R. 72.1(d)(2).

SO ORDERED.

Enter for March 11, 2009

S/ Roger B. Cosbey
Roger B. Cosbey
United States Magistrate Judge